Harvey Reiter on behalf of the Sacramento Municipal Utility District, Turlock Irrigation District, and the Transmission Agency of Northern California. With the Court's permission, I would like to reserve three minutes of my time for rebuttal. The Bonneville Power Administration concluded that it needed to nearly triple the rates for transmission service on its southern intertie, because unlike its prior case, only two years earlier, where it had rejected a proposal to increase the rates by roughly the same amount, circumstances had changed, and now hourly service had become a cheaper substitute for long-term firm service, and that customers given the choice would flock from long-term firm service to the cheaper hourly service, putting at risk its recovery of what had historically been 95 percent of its cost being recovered through those long-term contracts. The principal problem in this case is that the premise for the agency's decision that is contradicted by admissions by the agency staff and statements by the agency itself that the agency either ignores or glosses over. But we're not finders of fact here. Our job is to see whether substantial evidence supported the FERC decision, which is to say the agency decision, and maybe there's inconsistent statements, and maybe they said some things that a finder of fact might credit or not credit. But as I read this record, in 2016, when this proposal was made, the agency said it's not a terrible idea, but we don't have enough evidence yet to implement it. We'll study it. And they went out in the field and had hearings and did studies, and they came back with what was driving people away from the long-term transmission contracts, and therefore they wanted to raise the rate of the hourly one. I don't think that they're going to do that. I don't think that they're going to do that. Roberts. But just assuming that, if that's the case, would that be sufficient substantial evidence? Well, if in fact the case If it is the case and it's enough, tell me why it's not the case here. Well, if that was in fact the case, that there was that customers were really going to flock to long-term firm service, that would justify doing something. But the agency had an obvious solution to that problem, so let me talk about that first. Well, but let's just start out with what I asked. Yeah. Let's assume, would that be substantial evidence that would support some rate increase with respect to No, not necessarily. No? It would be substantial evidence to do something. And the agency had, according to the agency, that there's what both parties have described as the seams issue, that at the border between California and the Pacific Northwest, there were differences in the way schedules are made and that it was at least theoretically possible, it's been that way since 2008, theoretically possible that someone with an hourly service contract might be able to jump the line and sell power it had into California ahead of someone with long-term firm service. So there was an obvious fix to that problem. That's what they said causes this risk. They couldn't. Here's my question. Are they required by law to solve it in a different way? They are required by law to set rates that are the lowest possible rates. And that's good. You got me to the question I wanted to ask. I don't find anything in this record suggesting that you raised that issue to FERC. Well, we did raise it. I think they conceded we raised it at FERC, but the issue was whether we raised the issue before the Bonneville Powers Act. Sorry, before the Power Act. Did you? Yes, I think we certainly did. The agency certainly didn't address it. Well, they did. If you look at the very last sentence of their opinion, they make the determination that our rates are the lowest possible rates consistent with sound business principles, both for transmission and power services. So they certainly thought they were addressing it. They addressed the standards at the beginning of the decision. They addressed it, but did you all raise it? Yes. Where? Well, what we said was that... Where? Where? Excuse me, bear with me just a second, Your Honor. Well, you can tell me on your rebuttal, but I would like to know that. Yeah. BPA also states that your client did not participate in the public process regarding the rate making after 2016. Is this true? And if so, why didn't you? Well, Your Honor, we didn't typically participate in Bonneville proceedings, so we were not intimately familiar with the process. But that was a pre-rate case workshop. There were six months of proceedings even after that workshop where we did file comments, and we were told that it's too late for you to consider those comments about alternatives then, even though they hadn't filed their rate case yet. But there's two separate issues here. So one is whether you preserved the argument that they didn't consider other alternatives. But there's a separate question of whether you preserved the argument that the rates weren't the lowest possible ones. And so did you preserve that argument? Yes, I think we did, Your Honor. Where? Where? Again, if I can... See, I know you made a 16-838G argument that they should have... The argument that... Yes. But I don't see... Normally, when you're arguing that rates are too high, you say it should have been lower. It should have been this number. What you basically said was they shouldn't have raised rates at all because they should have looked at non-cost alternatives. Yes, that there was a way to solve their problem without raising the rates, that there was a lower-cost alternative. Okay. But we're not dealing here with an attack on the amount of the raise, are we? On the amount of the raise... Your contention is they shouldn't have raised them at all. Our argument was that they... No, I think it was a little more nuanced, not that. They said... Tell me where the... Joe and McGee asked the same question. Tell me where the nuance appears in your arguments to the BPA. I thought the argument there was, you shouldn't have raised rates at all, you should have done something different. Well, essentially, that's right, Your Honor. But we did say, and again, I want to emphasize that you only get to this lowest reasonable cost argument if you conclude that there was actually substantial evidence that hourly service had become a cheaper substitute for long-term firm service. And again, here, I think the... You look at what the agency staff said. Now, I don't think you can have substantial evidence when the agency contradicts staff... Why not? ...contradicts itself. Why not? What if the agency says, some of our people say this, I'm not sure that's what this record shows, but let me just ask it. Some of our people say that, we believe the people who say that, and therefore... They didn't say that. They didn't say, well, we considered this statement and we didn't consider... Well, but the contradictions can't, the mere contradictions in their record can't mean that there isn't substantial evidence. But the substantial evidence test, as the Supreme Court said in Consolidated is Edison v. NLRB, says that you have to take into account that which fairly detracts from the evidence on which you rely. And they don't square their decision with a couple of key things, including their own findings. So one thing the staff was asked, the staff's theory was, well, when customers have the choice, they're going to choose the service that they find most valuable. And we pointed out that the customers were continuing to renew. And the staff's answer, critical answer, was that they conceded that that reflected the fact that even at the lower hourly rate that was then in effect, customers continued to think that hourly, that long-term firm service was more valuable. That's why they're renewing. The agency itself in the BP-16 case had said that the customers that rely on hourly non-firm often cannot obtain it during times of high demand because capacity is being scheduled by customers with long-term firm service. That fact is unchanged. The staff acknowledged in this case that it is during the highest periods of demand that customers who seek service using hourly service are most likely to get refused. Those are the hours that are most important and the ones where the companies make their money. Companies have power supplies that they can sell into California when the demand is highest, whether it was in the evening hours or some other part of the day when it got hottest. That's when demand for electricity is highest and when the cost of producing it in California or Arizona or Nevada is highest, and when cheaper hydro can be sold at a high profit. That's when they make their money. The reason that customers' renewal rates for long-term firm service have been persistently high is what the agency itself said, what it said in that case and what it's said in this case. That's when the service is refused. They've said that at ER-189 that the Southern Intertie is one of the most valuable assets in the West Coast energy market. And they've said it at ER-119 and 184 that it's during these highest peak hours when the access is most valuable. That's also when it's most risky to rely on an hourly service. Mr. Ryder, can I ask you, it appears that BPA evaluated the non-rate alternatives to raising the hourly rates in the white paper. And so my question for you, is this enough or why isn't this enough under the arbitrary and capricious standard of review? I'm sorry, I don't quite understand the question. They discussed this, they evaluated this in the white paper. What they said at hearing was that they didn't rank those alternatives and they said, we plan to look at non-rate alternatives after this case is over. So if they'd actually done the evaluation, a statement like that would have made no sense at all. They said, we'll look at it after the case is over. Again, we only get to that issue if we conclude that there was a rational reason to think that the hourly service had now actually become a substitute. So you're essentially making an insufficiency of the evidence argument, aren't you? Well, it's the absence of the substantial evidence argument. Well, the absence or insufficiency. What you're essentially saying is that notwithstanding. Let me finish. I'm sorry, Your Honor. Notwithstanding the BPA's agency's conclusion that there was sufficient evidence to support the notion that they needed higher hourly rates, you think there wasn't enough evidence in which a rational finder of fact could find that, right? I think that's right. And in fact, Your Honor, this case is similar to a case that you decided in Village of Cake v. Department of Agriculture. There we had a situation, the risk assessment flipped. Wow. I remember that case. That was a case that dealt with whether an agency could undo a previous regulation without making a new record. Yes. You think that pertains to this? I think it does. Because what happened in that case was the applicants sought a waiver of the roadless rule, and the agency had previously found that putting roads through the Tongass Forest would create a substantial risk to the environment. Right. But here the agency said in 2016, this might be a good idea, let us study it. Well, they didn't say it might be a good idea, Your Honor. They went out and made a study, and whether the study is insufficient is a separate issue. What happened in the Village of Cake case is one, the agency said, no, no, we're going to have this roadless road rule. And then the new agency came in and said, no, no, we just changed our mind. We're just going to change it. Yes. No new record, no study in the meantime, no evidence, no hearings, just changed it. It's not your best case. No, but the critical fact, as you said in the case, the critical decision rested on this assessment of risk. The critical basis for the agency's rejection of the hourly rate increase in the BP-16 case was the fact that it was an inferior service, that hourly, non-firm hourly customers were often denied service. That fact hasn't changed. That's why the service is inferior. It's sort of rate-making 101 that we discussed in citing the Fort Pierce v. Firk case, that hourly service is inherently inferior. Non-firm service, by definition, can be denied. That underlying fact hasn't changed, and neither have the overt manifestations of that inferiority. The fact is, however, that customers continue to renew the long-term renewal rate, which the agency points to, hasn't really changed. They offer two, in fact, conflicting statements about non-renewals. First, they say that the reason that the renewals were high is, well, they were high because we promised to act on seams. They actually didn't act to fix the seams issue. And then they say, we have a troubling concern about a troubling trend of non-renewals. They claim both that their promise to act on seams, which they themselves characterized as speculation, their staff characterized as speculation, they say that that put a halt to non-renewals. And then they say, well, we're still worried about this troubling trend because of this one partial renewal by PowerX. The agency dismisses the only reference they actually make to the inferiority of hourly service is to say, well, in this case, we found that hourly service is available most of the time. I don't think if asked today, they would tell you that that's any different from what's always been the case for hourly service. I'm looking at 146 of the BPA decision, 172 of the ER. And the agency says, yeah, they got good renewal rates. But one reason they did was they went out to their biggest customers in 2016 and said, we're going to address this issue. And it was based on that promise to do precisely what they did in 2018, the agency itself describes that as speculation. They said, we can't know what the customers are thinking. Their own staff said we can't know what the customers are thinking. And what we do know are these facts. We know that at the time the customers made the decision, Bonneville concedes that the customers didn't know what action Bonneville would take. They also concede that at the time customers executed these multiyear contracts, they knew they'd be stuck with those contracts for the duration, whatever the agency did in the case. Those are the objective facts from which we know what happened. And again, I come back to what the staff itself said. The agency staff said that the reason customers were renewing was because hourly service was inferior. They valued long-term firm service higher, and even though the hourly rate was lower than it is now, this was before the rate increase. What do you do with the agency's finding that this was justified by a decline in the Q? Well, Your Honor, again, the agency's offered a variety of explanations. They said first, their staff says that the Q declined. I'm not interested in what their staff said. I'm interested in what the finding in the record is, which is that the decline in the Q was a good reason to do this. Was there a decline in the Q? Yes, of course there was a decline in the Q, and there was also an increase toward the end of the case in the Q of about 300 megawatts. The Q had gone up from the time the market rules went into effect in California. It nearly tripled. Then it went down. Then it went slightly up again. So they're looking at it when they're saying, we would like to avoid further declines in the Q. Can't they raise rates for that reason? It's one thing to take reasonable precautions. It's otherwise to take irrational precautions. And that's what they've done here. The agency itself has described this asset as one of the most valuable assets in the West Coast market, and they acknowledge that hourly service is still – that long-term firm service is still highly valuable in those peak hours of the day. That's when they make their money. It's like the good humor salesman who makes his money. He may have to lease a truck for a year, but he makes his money during those summer months when people are buying ice cream. That's why people hang on to long-term firm service. And the agency never really comes to grips with that. The Q itself, if you look at what's happened to the Q, there was a 500-megawatt decline related solely to 8 megawatts of capacity. The line was almost completely subscribed. And under their rules, the way they calculate the Q, you had customers who held 500 megawatts of capacity decline to take 8 megawatts. That turned into a 500-megawatt decline in the Q. Now, we don't know, and they don't know because they didn't ask why customers left the Q, but the way they structure the Q leads to a decline related to only 8 megawatts of 500 megawatts without any knowledge of whether those customers might still be interested in the service. We would be speculating, and that's what they're doing. Yes, Your Honor. Again, we would urge you to vacate that portion of the decision that raises the rates for hourly service on the Southern Intertie. Thank you. May it please the Court, My name is Courtney Olive, representing Respondent Bonneville Power Administration. This case concerns a Bonneville transmission rate increase that was broadly supported. Bonneville thoroughly explained its decision in a lengthy record of decision and addressed every one of the arguments that petitioners raised in over 50 pages devoted to their issues. Did you say nominal? No. Bonneville. Excuse me. Bonneville Power Administration. Yes, Your Honor. No, we recognize it was not a nominal increase, certainly not. I plan to talk about three things today. First, the substantial evidence that Your Honors will find in the record to support this rate increase. Second, the reasons why Bonneville acted in 2018 and not in the prior rate case. And finally, the lowest possible rates argument that petitioners are now raising but was not raised below. Maybe you could just start with that because I think it's one that I... I understand that what they said below was you didn't sufficiently consider non-rate alternatives. That's correct. And they preserved that argument. That was a policy argument that they made. We like these non-rate alternatives better than raising the rate. Right, but that's not an argument even being made to us, is it? That non-rate alternatives should have been considered. Well, as I understand the argument that is... Because I thought the argument was this one... The change wasn't supported by substantial evidence, number one. Number two, you didn't sufficiently explain your change of decision for 2016. And three, lowest possible rates. Those are their three arguments. Assuming lowest possible rates wasn't preserved, do we consider whether you sufficiently considered non-rate alternatives? Well, no. Bonneville rate cases are about setting rates. So we had to have a starting point somewhere. So after... As Your Honor recognized, we were presented with these issues in 2016. In that rate case, we said exactly as Your Honor described. Well, this might be a good idea. These are serious issues and they must be addressed. We launched the public process in which we considered the non-rate alternatives as well as possible rate solutions. And then we said, okay, as a starting point for the rate case, which is where rates are set, not these non-rate, you know, anything under the sun alternatives. As our rate case starting point, this will be our initial proposal. We will... And that's why I'm trying to figure out how this plays into our review of a rate setting case. It doesn't. Now, let's assume that you had considered no non-rate alternatives. You just said... That would be fine. We... That would be fine. We often... We refuse to consider non-rate alternatives. We often go through rate adjustment proceedings without launching into a public process that considers... that puts on sort of a menu of different options and non-rate alternatives. And I know I'm taking you off track, but that's why... I'm interested in that because I didn't think the question of whether you'd sufficiently considered non-rate alternatives was an issue in front of us. I thought the only issue in front of us was whether or not the lowest possible rates... That's correct. ...issue was rates. That is the issue. Okay. Yes, Your Honor. Thank you. Thank you for the detour. And that issue was... These petitioners vigorously contested this rate below. They filed over 200 pages of legal briefing. Not once did they utter the phrase lowest possible rates consistent with sound business principles, much less cite the statutory provision, much less say that this non-rate alternative... Because you didn't choose that, you've incurred some non-necessary expense, which they still don't identify what that might be. And therefore, you violated lowest possible rates. Of course, it is a general standard that applies to our rates. And of course, our rod established that rates were set under that general standard of lowest possible rates. The BPA stated that it would evaluate non-rate alternatives to raising the hourly transmission rates. Yes. And in the white paper, it appears that BPA did evaluate these non-rate alternatives.      Because, as the record of decision states, those non-rate alternatives were set under the general standard of lowest possible rates. And the BPA stated that it would evaluate those non-rate alternatives would have required effectively the hourly rate to be made less available. We would have to make fewer sales under the hourly rate. We would have to hold it back. And making the rate less available, Bonneville decided was worse than increasing the substantial increase that we had increasing the rate. So Bonneville said, well, rather than that, let's try the rate alternative. Yes, we said in the white paper that a bundle of non-rate alternatives and the rate alternative would be, I mean, if you had to do a brute force, you know, absolute most effective sledgehammer solution to this, it would be non-rate alternatives plus a rate alternative. But let's try the rate alternative for now. And that way we can have a singular focus on how that is working and see how it is working. Mind you, the non-rate alternatives carried with them their own costs and their own implications that were in the tune of millions of dollars. So they too had costs as well. So Bonneville pursued the rates alternative through its statutorily established 7i rate-making process and tabled effectively the non-rates alternatives. And so going back to the lowest possible rates, if we were to consider this argument, I guess, and how do you respond? I mean, why was 170% appropriate versus 100%? That's where we get into the fact that there's really no law to apply on the standard. It's not something where we can say, well, 170 is okay, maybe 120% would have been okay. The cases that we have cited to you, specifically the California Energy case and the two district court cases that came shortly after the Northwest Power Act came about say that in this specific type of context where you are allocating costs between rates as we were doing between the hourly rate and the long-term rate and the customers that buy under each of those rates, lowest possible rate. If you work through the numbers and even accepting your facts, you can achieve exactly what you want to with 100%. The problem here is that nobody has contended that some other rate would be the lowest possible rate. Exactly. Nor has anyone contended what the so-called non-necessary  that we incurred. But if the agency had made a determination one way or the other that the other rate proposed is not the lowest possible rate because we could review that for substantial evidence. The problem here is that there is no other rate. If that were all there were to it, Bonneville would lose every time it never picked the lower number. It is simply an administrator's business discretion judgment that the statute sets forth. This is not like the PNGC case that petitioners have cited where Bonneville engaged in a contractual obligation to pay out money to a customer and by paying out that 32 million dollars its other rates had to be increased to make up for it. That was a non-necessary expense. It is not what we have here. All we have here are the typical cost allocations between rates. In that setting California energy is very clear that there is no law to give substantial  to Bonneville's findings. To be quite candid while that standard applies all these so-called conflicts in the record that petitioners have raised if you look at those sites and you read the words that the witnesses say each and every single time there is no conflict there is no agency changing of position there is no broad speculation every last time  the witnesses have raised to you. If you look at it in context in the record of decision where it appears or in the witnesses testimony you will see they were making a general statement for instance they admitted the long term rate is a highly valuable product the only statement from a witness saying as a general matter when a customer chooses to buy the long term rate they are making a choice under their business practices as to what they value as a general matter. Here we have pages and pages of briefing based on that general statement the speculation statement this appears in page ER 170 this is Bonneville saying yeah we are not mind readers we have given you two pages of discussion why we think the renewal rates are not reflective of what may happen in this upcoming rate case and the massive amount of contracts that are up for renewal more than twice as many than were before the risk actually if I understand Mr. Writer's argument correctly some of it goes like this you may have had all these appropriate concerns but the rate increase that you chose isn't rationally related to any of those concerns that Mr. Writer considers rational or irrational is not the test it's the administrator's business judgment and explained as explained in the record that we have twice as many contracts up for renewal in this rate case half as many people waiting in line we have customers who have told us through the public process that we just finished that long term isn't as valuable as it used to be and due to these seams issues and the increase in solar power in California we can use hourly instead the peak hour and Judge Hurwitz to your point about well it wasn't really the right number yes it was it was exactly the right number because these rates are set under a formula that links the two the hourly rate and the long term rate together and that's where this peak hour number comes in so the principle is this in the long term rate if you are using that if you buy that service you are allowed to transmit power 24 hours a day seven days a week that's the benefit of buying that a steady customer exactly which is critical to our agency and that's why we recover 95% of the cost under that long term rate we must have that stable predictable cost recovery typically five year contracts the principle is that hourly or long term is priced  certain amount because you can use it all the time hourly if you are using it for the most long term customer for generations the rates have been set in that way so that if you are using it for those peak hours which had been 80 hours a week which if you had gotten long term service we reduced that to a fewer number of hours to reflect the realities of the California market where the peak had dropped to 10 p.m. from roughly 5 to 10 p.m. I take it it follows that the rate in those peak hours is higher than the rate was before well it's not that it's that that peak hour number gets plugged in you need to make more money yes or if you were charging under the old setup a customer was being charged an hourly rate which said well if you're using it up to 25 hours and it's not costing them nearly as much as it would for long term service so we're now going to recognize that change in peak which was well established not only our studies but the that's what got us to the 170% we didn't just say I think 170% would be good we plugged in the new peak number recognizing the reality of the shortened peak in California and that's what got   recognize that change in peak would their rates have gone up if they had bought less than 25 hours worth of hourly their rates would not go up it depends on how many hours worth of hourly they buy once they buy up to 25 hours worth they are going to hit that increase exactly correct I think it was a $9.56 increase the one proposed before would have been a $13 increase that was not adopted correct your honor this notion that we had a public process and these petitioners tried to comment and the process ended with the white paper and they came in six months later and tried to submit comments so there was no change in the rate being unavailable and therefore not a viable substitute wrong his own witness is the one that testified at the agency level that hourly is available most of the time and studied that and says his witness is probably underestimating how much hourly is available because he hasn't considered the fact that the customer could ask for twenty five hours and twenty three until they got their request granted so it's probably more available than he says and we know that customers weren't having a problem getting hourly because if they had been the long term customers who are allowed to resell long term transmission would have been reselling long term to them and they weren't doing that that only happened one time are you required under the statutes to provide hourly service in other words could the agency opt only to have long term contracts Bonneville has discretion as to what type of services are provided on the rates so there are several hourly multi day no we are not required to recover costs that is the only statutory transmission rate setting you could provide only long term contracts if that recovered your costs I suppose so theoretically if the market supported that I'm trying to figure out what your obligation is with respect to providing short term the obligation is simply to recover the costs of our  that's the one statutory rate setting obligation at play here there is one that says same cost to federal and non-federal users but that's not an issue here let's see oh another perfect example of petitioners taking generalized statements out of context is Mr. Ryder says well the reason they renewed long term is because they valued it as a highly valuable thing we don't contest that the line itself is highly valuable the question is how to price the two services that so I see that I'm over time I'll simply summarize by saying Bonneville had ample substantial evidence both under the cost allocation argument between hourly and long firm and the peak number that drove that and under the rate setting prediction and projection that it may not achieve cost recovery because the customers were indicating that they may not renew long term and there were many long term agreements up for renewal and then petitioners argument about lowest possible rates has of course been waived thank you thank you a couple of a couple of brief points council for Bonneville said we testified that hourly service is available most of the time that's true that's not the point hourly service is available in the winter when demand is lower it may not be available when it's highly valuable that's why customers chose to renew their contracts and have for years and continue to renew their long term firm contracts the agency in its decision ER157 says it seems issues have made it feasible for customers to switch hourly service for long term firm service but it was the increased effect on peak hours that made it economical the problem with that statement is they had a fix if they thought that was the case then they could have made it more difficult for customers to purchase hourly service they expressed a sudden solicitude in their final order for these customers they said well if we actually restricted the availability of hourly service which would in fact have fixed the seems problem that caused people to bone is their failure to adopt non-rate alternatives in front of us in this rate case yes I think it is a case that the rate alternatives were not considered yes it was a case you cite for them I think that the non-rate alternatives that would avoid the need for the rate increase are similar to incurring unnecessary expenses and we've cited the this court's decision affirming the citing the Johnson case from the 6th circuit that says incurring unnecessary expenses results in rates that are not the most reasonable cases. My problem is incurring unnecessary expenses is something that the business does. Here what they're saying is look they're not saying it. There were non-rate alternatives because we want to recover our costs. I'm having trouble finding an imperative other than their internal policies under statute that they consider non-rate alternatives in a rate increase case. Tell me where that comes from. I think that comes implicitly from the notion that if you can establish a lower rate using sound business judgment and one of those would be to adopt a rate alternative that fixes the problem you're trying to solve and you don't do that you're not using sound business judgment. You had a way to avoid the problem and you ignored it. And the result was higher rates than were necessary. I think that's implicit in what they mean by lowest possible rates consistent with sound business judgment. That includes taking into account the fact that the rate alternatives are not the best alternatives to the rate increase Bonneville ultimately adopted. And I think they've acknowledged that that's exactly what we did. That's the question I tried to ask you before. You really never went in and said there's a lower rate increase that you might adopt. What you said was you can't do a rate increase at all. Right? Yes? That's semantics, Your Honor. There is a lower rate. Those are semantics. That's the only way we can speak. There is a lower rate. The statute doesn't say the lowest rate increase possible. It says the lowest rates possible. We're speaking over each other. My question is, you never said there's a rate increase that might work, but it's not this one. What you said was you're not entitled to increase your rates at all. What we said was it's unnecessary to raise your rates at all. They weren't the lowest rate you were entitled to. What            Judge. Thank you, Mr. Judge. All right. Let's get back to the closing argument, the statute. It says that it wouldn't           that it would not be a crime to have a wife. The statute says that it would not be a
judges: Murguia, Hurwitz, Gaitan